# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO. 21-cr-28-APM |
| v. | : |
| THOMAS CALDWELL (1), | : |
| DONOVAN CROWL (2), | : |
| JESSICA WATKINS (3), | : |
| SANDRA PARKER (4), | : |
| BENNIE PARKER (5), | : |
| LAURA STEELE (7), | : |
| KELLY MEGGS (8), | : |
| CONNIE MEGGS (9), | : |
| KENNETH HARRELSON (10), | : |
| ROBERTO MINUTA (11), | : |
| JOSHUA JAMES (12), | : |
| JONATHAN WALDEN (13), | : |
| JOSEPH HACKETT (14), | : |
| JASON DOLAN (15), and | : |
| WILLIAM ISAACS (16), | : |
| Defendants. | : |

## GOVERNMENT'S OPPOSITION TO DEFENDANTS'
## MOTION TO TRANSFER VENUE

This Court should try this case here, in the District of Columbia. The Court should reject the defendants' motion to transfer venue.

## BACKGROUND AND PROCEDURAL HISTORY

On May 26, 2021, the grand jury returned a Fourth Superseding Indictment, charging all of the defendants with count 1, conspiracy, in violation of 18 U.S.C. § 371; count 2, obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2; and count 4, entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. §§ 1752(a)(1). Ten of the defendants—Crowl, Watkins, Sandra Parker, Steele, Kelly Meggs, Connie Meggs, Harrelson, Hackett, Dolan, and Isaacs—were also charged with count 3, destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361, 2. Five of the defendants—Crowl, Watkins, Sandra Parker, James, and Isaacs—were charged with counts 5, 6, and/or 7, civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3), 2. James was charged with count 8, assaulting, resisting, or impeding certain officers and aiding and abetting, in violation of 18 U.S.C. §§ 111(a)(1), 2. And finally, four of the defendants—Caldwell, Kelly Meggs, Harrelson, and James—were charged with counts 9, 10, 12, and 13, respectively, for tampering with documents or proceedings, in violation of 18 U.S.C. § 1512(c)(1).

Each count charges that the alleged conduct took place at least "within the District of Columbia" (sometimes also "and elsewhere").

Defendant Caldwell moved to transfer venue of the trial to the district in which he lives, the Western District of Virginia. (ECF 273 at 20.) His motion was filed pursuant to Federal Rule of Criminal Procedure 21(a) ("for prejudice"), rather than Rule 21(b) ("for convenience"). Ten other defendants joined Caldwell's motion: Crowl (ECF 285), Watkins (ECF 307), Bennie Parker

(ECF 284),[1] Steele (ECF 309), Kelly Meggs (ECF 298), Connie Meggs (ECF 304), Harrelson (ECF 276), Minuta (ECF 287), Walden (ECF 290), and Isaacs (ECF 303).

## ARGUMENT

**I.    LEGAL STANDARD.**

The United States Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, cl. 3, before a "jury of the State and district wherein the crime shall have been committed," U.S. Const. amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958); *see United States v. Levy Auto Parts*, 787 F.2d 946, 952 (4th Cir. 1986) (noting that the "Constitution requires that local crimes be prosecuted locally"). And they give rise to "a general presumption that a criminal prosecution should be retained in the original district." *United States v. Bowdoin*, 770 F. Supp. 2d 133, 138 (D.D.C. 2011).

Federal Rule of Criminal Procedure 21(a) allows a court to transfer venue of a case "if the court is satisfied that so great a prejudice against the defendant exists" such that "the defendant cannot obtain a fair and impartial trial" in the local District. *See Skilling v. United States*, 561 U.S.

---

[1] Defendant Bennie Parker joined the motion but caveated that he did not "explicitly adopt certain 'political comments' or 'partisan surplusage' included in that motion, especially statements found in pages 13 through 18." (ECF 284 at 1 n.1.) Many of the statements in Caldwell's motion are not just "political" or "partisan," but are outright odious. They are irrelevant and incendiary, and they have no place in a legal brief. Because Caldwell's motion can summarily be denied based on legal precedent, the government does not address the specific comments here. But if Caldwell or his counsel persist in sullying the sanctity of this proceeding, the government may move to strike his pleadings or for other relief.

358, 378 n.11 (2010) (noting that Rule 21(a) allows venue transfer only if "extraordinary local prejudice will prevent a fair trial"). This is an exacting standard, and one that is infrequently met.

It is the defendants' burden to establish their entitlement to a transfer of venue under Rule 21(a). *United States v. Caldwell*, 543 F.2d 1333, 1342 (D.C. Cir. 1974). The en banc D.C. Circuit has explained that a pre-voir dire request for a change of venue may be warranted only in "extreme circumstances," and that an "extensive voir dire" can usually assure that the defendants are "tried by an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *United States v. Haldeman*, 559 F.2d 31, 60, 70 (D.C. Cir. 1976) (en banc) (per curiam).

Many court cases have generated significant publicity, both locally and nationally. But "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381 (emphasis in original). Indeed, appellate courts have uniformly affirmed the denial of pre-trial transfer motions in some of the most notorious cases in this country's recent history: Dzhokhar Tsarnaev, one of the Boston Marathon bombers; Jeffrey Skilling, a longtime Enron executive; Zacharias Moussaoui, who conspired to commit the September 11 terrorist attacks; Ramzi Yousef and others who committed the 1993 World Trade Center bombing; and, in this jurisdiction, former Attorney General John Mitchell and others charged as part of the Watergate scandal. *See Skilling*, 561 U.S. at 399; *In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003); *Haldeman*, 559 F.2d at 70.

The same holds true here. The defendants' pre-voir dire motion to transfer venue should be denied as premature. As in *Haldeman* and other heavily publicized cases from this jurisdiction and elsewhere around the country, extensive pre-trial screening and voir dire will suffice to ensure that defendants receive a fair trial by an unbiased jury.

II.     **THE CASE SHOULD NOT BE TRANSFERRED.**

    A.     **The motion is premature.**

Under longstanding D.C. Circuit precedent, the proper time for a court to evaluate a motion for a transfer of venue based upon prejudicial pretrial publicity is after voir dire. In the overwhelming majority of cases, thorough juror screening and extensive voir dire are sufficient to ensure that all seated jurors can be fair and impartial and to provide criminal defendants with the fair trial to which they are entitled.

As the D.C. Circuit has explained, "[t]he ultimate question" on a motion to transfer venue based upon prejudicial pretrial publicity "is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the voir dire examination." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967) (internal citation and quotation omitted). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire. The defendant[s] will then be entitled to any actions necessary to assure that [they] receive[] a fair trial." *Haldeman*, 559 F.2d at 63. Consistent with this approach, notwithstanding the "extraordinarily heavy coverage in both national and local news media" that the Watergate scandal received, the court in *Haldeman* held that "the District Court was correct to follow this circuit's well established procedure by refusing [the defendants'] pre-voir dire requests for . . . a change of venue." *Id.* at 59, 63-64.

Other courts agree that "the preferable procedure" is for a trial court to defer decision on a motion to transfer based on prejudicial pretrial publicity until after it has conducted voir dire. *See United States v. Campa*, 459 F.3d 1121, 1146-47 (11th Cir. 2006) ("Indeed, we have ruled that a trial court's method of holding its decision on a Rule 21 motion for change of venue in abeyance until the conclusion of the voir dire is clearly the preferable procedure.") (internal quotation

5

omitted); *see also United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991) ("Only where voir dire reveals that an impartial jury cannot be impanelled would a change of venue be justified."); *United States v. Poludniak*, 657 F.2d 948, 955 (8th Cir. 1981) ("This court has repeatedly held that it is preferable to await voir dire before ruling upon motions for change of venue."); *United States v. Gullion*, 575 F.2d 26, 28 (1st Cir. 1978) ("We find that the trial judge did not abuse his discretion in denying the motion for a change of venue until he could consider the effect of any pretrial publicity at the time of conducting the voir dire of prospective jurors."); *United States v. Williams*, 523 F.2d 1203, 1209 n.10 (5th Cir. 1975) ("Holding a final decision on the motion in abeyance pending the conclusion of voir dire is clearly the preferable procedure."). As the Seventh Circuit has explained, it is "ordinarily preferable to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors, instead of in the vacuum of a hearing without reference to prospective jurors." *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986).

The D.C. Circuit has historically preferred voir dire of potential jurors as a means of dealing with pretrial publicity, and the Supreme Court has not barred a court from deferring the decision on a change of venue motion until voir dire. If the jury pool might not be impartial, voir dire will lead to that determination. *See United States v. Edmond*, 52 F.3d 1080, 1097 (D.C. Cir. 1995) ("The results of the *voir dire* itself demonstrate that the community was not inflamed against the defendants."). Indeed, although the defendants claim to have received outsized media attention, it is unlikely that any significant segment of this District's population knows these specific defendants by name, much less the crimes they are accused of committing. *See id.* ("As we have discussed, less than a third of all prospective jurors ever *had heard* of any of the defendants from

6

the media, much less formed an opinion about their guilt."). Even if they had, "the mere fact that trial jurors have *heard of* a defendant does not give rise to the assumption that they are *prejudiced against* the defendant except in cases of extremely prejudicial pretrial publicity." *Id.* And, as the D.C. Circuit found in *Haldeman*, it is possible in this District to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial" even when an overwhelming percentage of the potential jurors have heard of the defendants and their crimes and have formed an opinion of the defendants' guilt. 559 F.2d at 70, 144.

The defendants cite two cases to support their argument that a pre-voir dire transfer is warranted, (*see* ECF 273 at 2, 12), but neither case stands for that proposition. In the Oklahoma City bombing case, the parties did not disagree about transferring venue out of the district encompassing Oklahoma City (whose federal courthouse was itself damaged during the bombing). *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996). The court stressed that "[o]rdinarily, the effects of pre-trial publicity on the pool from which jurors are drawn is determined by a careful and searching voir dire examination. That is the preferred practice." *Id.* And, in a perjury case related to the September 11 attacks, *after the court had conducted a careful voir dire*, the court opined in dicta that had the defendant been charged with committing the attacks, "it is possible to imagine that the prejudice in this case would be comparable to the community scrutiny and outrage that justified a change of venue in *McVeigh*." *United States v. Awadallah*, 457 F. Supp. 2d 246, 252 (S.D.N.Y. 2006). But he was not, and voir dire was able to ensure an impartial jury. *Id.*

In any event, because the question whether it is possible to select a fair and impartial jury is one that can only be answered after a thorough voir dire, this Court should follow the D.C. Circuit's well-established procedure and deny defendants' pretrial motion to transfer venue.

### B. The Defendants Have Not Established Circumstances So Extreme As To Warrant a Presumption of Prejudice.

The Supreme Court has recognized that there may arise a "presumption of prejudice" resulting from sufficiently prejudicial pretrial publicity, but that presumption is appropriate "only [in] the extreme case." *Skilling*, 561 U.S. at 381. "[N]ews accounts of the crime" do not "alone presumptively deprive[] the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). Jurors are not required to be "totally ignorant of the facts and issues involved," as "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). And "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). Consistent with these well-established principles, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history, as cited above.

In none of these cases did the courts apply a presumption of prejudice arising from extensive pretrial publicity of the defendants' crimes. Indeed, as discussed below, the D.C. Circuit appears to have never applied such a presumption. And the Supreme Court has done so in only three "extreme" cases: *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *See Skilling*, 561 U.S. at 379 (describing *Rideau*). The Court presumed prejudice because, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. In *Estes*, "extensive publicity before trial swelled into excessive

8

exposure during preliminary court proceedings as reporters and television crews overran the courtroom and 'bombard[ed] . . . the community with the sights and sounds of' the pretrial hearing. The media's overzealous reporting efforts . . . 'led to considerable disruption' and denied the 'judicial serenity and calm to which [Estes] was entitled.'" *Skilling*, 561 U.S. at 379-80 (quoting *Estes*, 381 U.S. at 536). And in *Sheppard*, "a 'carnival atmosphere' pervaded the trial": "'[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom,' thrusting jurors 'into the role of celebrities.'" *Id.* at 380 (quoting *Sheppard*, 384 U.S. at 353, 355, 358).

Notably, in *Sheppard*, the Court found that "months" of "virulent publicity about Sheppard" and his crime—including "a three-day inquest" during which "Sheppard was examined for more than five hours without counsel" that was "televised live" and "ended in a public brawl"—did not by itself deny the defendant his right to due process. 384 U.S. at 354; *see Skilling*, 561 U.S. at 380 ("Pretrial media coverage, which we characterized as 'months [of] virulent publicity about Sheppard and the murder,' did not alone deny due process.") (internal citation omitted). Nor has either the Supreme Court or the D.C. Circuit presumed prejudice in any case in the 55 years since *Sheppard* was decided. To the contrary, in *Patton v. Yount*, the Supreme Court held that the trial court did not err "in finding that the jury as a whole was impartial" even where "voir dire showed that all but 2 of 163 veniremen questioned about the case had heard of it, and that, 126, or 77%, admitted they would carry an opinion into the jury box." 467 U.S. at 1029, 1032 (1984). In *Mu'Min v. Virginia*, the Court declined to presume prejudice despite "substantial" pretrial publicity that "w[as] not favorable" to the defendant. 500 U.S. 415, 429 (1991). And in *Skilling*, the Court refused to presume prejudice notwithstanding "the magnitude and negative tone of media attention directed at Enron" because of the "large, diverse pool of potential jurors" in the Houston

9

area; the fact that, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight;" "over four years [had] elapsed between Enron's bankruptcy and Skilling's trial;" and "Skilling's jury acquitted him of nine insider-trading counts." 561 U.S. at 382-83.

Similarly, in *Haldeman*, the D.C. Circuit declined to find that the defendants' "due process rights were violated by the District Court's refusal to grant . . . a change of venue prior to attempting selection of a jury" notwithstanding the "massive," sometimes "hostile in tone and accusatory in content," pretrial publicity. 559 F.2d at 61-62. The court explained that, "unlike the situation faced by the [Supreme] Court in *Rideau*," the publicity surrounding Watergate gave the court "no reason for concluding that the population of Washington, D.C. was so aroused against [the defendants] and so unlikely to be able objectively to judge their guilt or innocence on the basis of the evidence presented at trial that their due process rights were violated." *Id*. The D.C. Circuit has similarly refused to presume prejudice in numerous other cases involving both national crimes such as Watergate and notorious local criminals. *See, e.g.*, *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995) (declining to presume prejudice, which "is reserved for only the most egregious cases"); *Edmond*, 52 F.3d at 1099 ("Neither the nature nor the impact of the publicity in this case presented the 'extreme circumstances' necessary to establish a presumption that a fair trial was impossible in this jurisdiction."); *United States v. Ehrlichman*, 546 F.2d 910, 916 n.8 (D.C. Cir. 1976) ("An examination of the voir dire process and its results in this case makes clear that the extreme circumstances condemned by the Supreme Court in . . . *Sheppard* . . . and *Rideau* . . . are not present here."); *United States v. Chapin*, 515 F.2d 1274, 1287 (D.C. Cir. 1975)

10

(rejecting "the argument [] that no voir dire would have been effective in rooting out the prejudices of which [the defendant] complains").

This case is nothing like the few "extreme case[s]" in which the Supreme Court has presumed prejudice based upon adverse pretrial publicity. The news stories about defendants have "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. Indeed, given the sheer number of people involved in the attack on the Capitol, it is unlikely that more than a handful of District residents could identify any of the defendants by name. Reporting on the defendants contains nothing resembling a confession, and thus is entirely dissimilar from *Rideau*, where "[w]hat the people of Calcasieu Parish saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff." 373 U.S. at 725. Whereas "Rideau's dramatically staged admission of guilt . . . was likely imprinted indelibly in the mind of anyone who watched it," *Skilling*, 561 U.S. at 382-83, the defendants provide no reason to believe that, by the time their trial begins, jurors in this District are likely to be able to remember and distinguish the reporting about them from that involving the many hundreds of other people charged as part of the attack on the Capitol. And even if they could, "[p]rominence does not necessarily produce prejudice." *Id.* at 381.

The size of the District's population likewise distinguishes it from those few cases in which the Supreme Court has presumed prejudice. The Census Bureau estimates the District's population to be around 705,000 people, *see* QuickFacts, District of Columbia, *available at* https://www.census.gov/quickfacts/DC, far more than the 150,000-person Louisiana parish at issue in *Rideau*, 373 U.S. at 724. Indeed, the District is more populous than the 600,000-resident Clark County

was in 1988, but a four-Justice plurality nonetheless concluded in *Gentile v. State Bar of Nevada* that there was a reduced likelihood of prejudice there "[g]iven the size of the community from which any potential jury venire would be drawn." 501 U.S. 1030, 1044 (1991).

Although there has been substantial publicity surrounding the attack on the Capitol, that reporting has largely focused on the attack generally—publicity has also been nationwide, not merely "local." *Skilling*, 561 U.S. at 378; *see, e.g.*, *In re Tsarnaev*, 780 F.3d at 22 ("It is true that there has been ongoing media coverage of the advent of the trial and petitioner's pre-trial motions, both locally and nationally. But that would be true wherever trial is held, and the reporting has largely been factual."); *Haldeman*, 559 F.2d at 64 n.43 (noting that "a change of venue would have been of only doubtful value" where the pretrial publicity was nationwide in scope and where the crime was "simply not a local [one] of peculiar interest to the residents of the District of Columbia"). Finally, this Court can take measures to prevent a "carnival atmosphere" from pervading the defendants' trial and denying them "judicial serenity and calm" to which they are entitled. *See Sheppard*, 384 U.S. at 358 ("The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court.").

The defendants nonetheless argue that the court should transfer this case *now*, without first conducting voir dire to evaluate whether it is possible to select an impartial jury, on the ground that "potential District jurors loathe Donald Trump and, by extension, his supporters." (ECF 273 at 13.) The defendants go on to make sweeping and offensive claims about District residents and their (allegedly homogenous) viewpoints, casting both aspersions and a wide net in their claim that so many District residents have such an "antipathy towards Trump and his supporters" that it would be "impossible" to locate impartial jurors here. (*Id.* at 14.) Among other baseless assertions about District residents, the defendants claim that a jury in this District "will be overwhelmingly (or,

perhaps, exclusively) composed of individuals who . . . hate [the defendants] because [they are] Trump supporter[s] . . . have nothing culturally in common with [the defendants] . . . [and] [w]ho will feel peer pressure from the local 'cancel culture' to convict." (*Id.* at 19-20.) For these unsubstantiated reasons, the defendants claim that this Court should not even attempt to pick a fair and impartial jury in this case.

As previously discussed, the D.C. Circuit rejected just such an argument in *Haldeman*, 559 F.2d at 64 n.43. There, the defendants were not just vocal supporters of President Nixon, but were former high-ranking officials in his administration. *Id.* at 51. And the defendants were not among many hundreds charged in a high-profile crime of nationwide significance, but were instead just seven, nationally known figures "charged [in] what amounted to an unprecedented scandal at the highest levels of government," that "led to the resignation of President Nixon." *Id.* at 51, 54 n.15. Notwithstanding the fact "that Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party, as opposed to the Republican Party to which the defendants . . . belonged," and that roughly 80% of the voters in D.C. voted for the Democratic Party candidate when Nixon ran for president in 1968 and 1972, *id.* at 160, there was no legal support for the proposition "that a community's voting patterns are at all pertinent to venue." *Id.* at 64 n.43. Significantly, although 93% of the Washington, D.C., population knew about the charges against the *Haldeman* defendants and 73% of those individuals had an opinion of the defendants' guilt or innocence, *id.* at 144, the court of appeals nonetheless held that the district court "was correct to follow this circuit's well established procedure by refusing [the defendants'] pre-voir dire requests for . . . a change of venue." *Id.* at 63-64. And it found that an "extensive voir dire" ultimately assured that the defendants "were tried by an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Id.* at 70. If "the District of Columbia's voting record in the past

13

two presidential elections" is not relevant to venue in a case involving high-ranking members of the president's administration, *id.* at 64 n.43, it surely has no bearing on venue here.

As the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases. High-profile individuals such as Oliver North, John Poindexter, Scooter Libby, and, more recently, Roger Stone, all received fair trials in this jurisdiction by unbiased juries. *See United States v. North*, 910 F.2d 843 (D.C. Cir. 1990); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-cr-0018 (ABJ), 2020 WL 1892360 (D.D.C. April 16, 2020). Indeed, in *Stone*, the court rejected an argument similar to the one the defendants make here:

> At bottom, the defense merely posits that if you do not like Donald Trump, you must not like Roger Stone, or if you are concerned about racism on the part of some of the President's supporters, then you must be applying that label to Roger Stone because he was a supporter, too. While there is no evidence that proves this hypothesis, there is evidence that contradicts it . . . . At bottom, the motion appears to be based on the defendant's assumption that the juror must have known who he was, what his relationship with Donald Trump has been over time, and what role he played in the campaign, and that since he was so central to the election, one could not possibly view him independently from the President. . . . But there is no basis to conclude that Roger Stone was a household name in . . . Washington, D.C.

2020 WL 1892360, at *30-31. The court went on to explain that "[t]he case law in this Circuit makes it clear that one cannot assume that people in the community—even those who follow the news—have a deep understanding of the facts of a particular case. During the prosecutions that arose out of the Watergate and Iran-Contra investigations, the Court of Appeals repeatedly expressed its confidence that jurors with open minds could be found within the District, even though the investigations had received a great deal of public attention." *Id.* at *31. The same is true here.

In addition to being legally unsupported, the defendants' assertions are also baseless. For example, the defendants claim that media coverage has "inflamed and prejudiced [District residents] against [them]." (ECF 273 at 11.) As support for that proposition, the defendants cite articles by *national* publications such as Bloomberg, the Daily Beast, Reuters, the Washington Post, the Wall Street Journal, and CBS News' *60 Minutes*. (ECF 273 at 3-5.) However, the defendants repeatedly note that these media outlets are "DC-based," (*id.* at 10, 18-19), as if to suggest that their impact is somehow felt more deeply in the District than elsewhere in the nation.

The defendants' assertion that there has been a "military occupation of the District," (ECF 273 at 8), is likewise unfounded. Whatever curfew, road closures, and other limited restrictions may have been imposed in the days immediately following the attack on the Capitol, (*see* ECF 273 at 11-12), most, if not all, restrictions have been lifted. To state the obvious, the fact that there were National Guard troops protecting the U.S. Capitol building itself is significantly different from a "military occupation of the District" or a "shutdown of D.C." (*Id.* at 8.) Long on hyperbole and short on actual facts, these assertions are emblematic of the defendants' motion as a whole.

Ultimately, the defendants misplace their reliance on *Skilling* in an attempt to demonstrate that this Court should presume prejudice and transfer their case without even attempting to choose an impartial jury here. (*See id.* at 2). The Supreme Court identified four "[i]mportant differences" in Skilling's prosecution from cases with a "presumption of juror prejudice": (1) size and characteristics of the community, (2) type of information being reported about the defendants, (3) time elapsed between the crime and the trial, and (4) whether the jury's verdict in that case or related cases indicates impartiality. *Skilling*, 561 U.S. at 381-84. As discussed above, the first two factors weight heavily against presuming prejudice. The third factor also weighs against presuming prejudice: the first trial date of January 31, 2022, will occur over a year after the attack

15

on the Capitol.  *Cf. Rideau*, 373 U.S. at 728 (Clark, J., dissenting) (noting that trial commenced within two months of the murder).  The fourth factor—whether the jury's verdict indicates impartiality—is unknowable at this stage.

Courts routinely conclude that, despite significant negative pretrial publicity, defendants received a fair trial in the location where they committed their crimes.  This was true in *Skilling*, notwithstanding "the community passion aroused by Enron's collapse and the vitriolic media treatment" aimed at Skilling.  561 U.S. at 377.  This was true for Dzhokhar Tsarnaev, one of the Boston Marathon bombers, notwithstanding the fact that "the reporting of the events" in that case "st[ood] unrivaled in American legal history (at least as of today)."  *Tsarnaev*, 968 F.3d at 42.  It was true for Zacharias Moussaoui, who was prosecuted "in the Eastern District of Virginia, minutes by car from the Pentagon."  *In re Tsarnaev*, 780 F.3d at 16; *see Moussaoui*, 43 F. App'x at 613.  It was true in the World Trade Center Bombing case.  *See Yousef*, 327 F.3d at 155.  It was true in the post-Watergate prosecutions.  *See Haldeman*, 559 F.2d at 70-71.  And it is true here, too.

But the question whether the Court ultimately can select an impartial jury for the defendants' trial is one that the Court need not answer today.  Rather, the only question before the Court at this time is whether to presume that, whatever jury it picks, and whenever it picks that jury, the defendants cannot possibly receive a fair trial in this jurisdiction.  Because such a presumption has no legal or factual support in this case and runs counter to the D.C. Circuit's "well established procedure" against answering that question before conducting voir dire, the Court should deny the defendants' motion.

## CONCLUSION

The government respectfully submits that the Court should not transfer venue of this case.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793

By: _____
Jeffrey S. Nestler
Assistant United States Attorney
D.C. Bar No. 978296
Ahmed M. Baset
Troy A. Edwards, Jr.
Louis Manzo
Kathryn Rakoczy
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530
jeffrey.nestler@usdoj.gov
202-252-7277

*/s/ Alexandra Hughes*
Alexandra Hughes
Justin Sher
Trial Attorneys
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20004