## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff | ) | Criminal Case 21-CR-28 |
| | ) | |
| v. | ) | Sentencing: August 29 & 31, 2023 |
| | ) | |
| WILLIAM ISAACS | ) | Judge Amit P. Mehta |
| Defendant | ) | |

### SENTENCING MEMORANDUM

Defendant William Isaacs ("Defendant" or "Mr. Isaacs") hereby files a sentencing memorandum with this Honorable Court.

### RECOMMENDATION OF VARIANT SENTENCE

Pursuant to the factors set forth in 18 U.S.C. § 3553(a), this Court "shall impose a sentence *sufficient, but not greater than necessary*[.]" (emphasis added).  In its Presentence Report ("PSR") for the Defendant, the U.S. Probation Office ("USPO") has a calculation under the U.S. Sentencing Guidelines ("USSG") of 70-87 months of incarceration (Level 27) before any downward variance.

However, the United States seems to recommend a sentence that is *vastly more than necessary* based on its contrary view of the USSG (Level 30): 97-121 months of imprisonment. Unlike the United States' request of up to 121 months in prison, the USPO has compassionately acknowledged and recognized the Defendant's unique personal history and characteristics. Toward that end, the USPO wisely recommends a 75% downward variance from the government's Level 30 request, i.e., a sentence of 24

<u>months of imprisonment</u>. The USPO justifies the variance because of Mr. Isaacs' ASD and his "long history of social problems."

By agreeing and objecting to some of the calculations by the USPO and the United States, the Defendant submits that the USSG should reflect a Level 13 (12-18 months). Although Mr. Isaacs is grateful for and agrees with the USPO's thoughtful USSG position of 24 months incarceration, he nonetheless seeks a further variance under § 3553(a). The Defendant respectfully asks this Court for a concurrent sentence of six months of home confinement, plus three years of supervision, for each of the seven counts of conviction.

## THE ISOLATED AND UNIQUE LIFE OF MR. ISAACS

Notwithstanding the overly aggressive tone used by the United States in its sentencing memorandum (ECF Doc. 1021-1), William Andrew Isaacs was not the soldier wishing for and ready for battle and mayhem, when he travelled to and arrived in Washington, D.C. on January 6, 2021, at the impressionable age of 21. He was emotionally wounded, oftentimes a loner, socially isolated, an introvert, and a solitary figure. He was the perfect candidate for the negative and manipulative influence of his aunt Traci Isaacs, who frequently tried to poison his susceptible mind with absurd conspiracy theories and vile prejudices. From the time he was born in December 1999 and well before January 6, Mr. Isaacs has faced many emotional challenges, which are recognized by the USPO, which should neither be discounted, dismissed, nor ignored.

Mr. Isaacs has a deep and painful sense of shame, humiliation, remorse, and embarrassment for his actions on January 6. The United States wrongly asserts

(emphasis added) that he came to Washington "*ready* to engage in political violence," "*ready* to use force to interfere with the certification of the election," "*prepared* for battle," and "willing to *resort to violence* against politicians who tried to stand in his way."

Putting aside its strained interpretation of the trial evidence, these rhetorical comments are belied by what Mr. Isaacs understands is the evidence in the possession of the United States. He travelled by car to Washington with two relatives (his aunt and her husband Luis Hallon) and a female acquaintance (Leslie Gray), all three of whom have pleaded guilty to January 6 criminal charges, for the purpose of providing security and to get EMT training. Mr. Isaacs is not aware of any inculpatory evidence from his fellow riders, whom the United States has apparently and extensively debriefed, to suggest that he had the mens rea and was *ready* to use force and engage in political violence of any kind on January 6.

Mr. Isaacs concedes that he bought protective gear to protect himself from the expected violence of counter protestors. He admits that he joined the Oath Keepers at the urging of his aunt. And he is ashamed. After reading of a false story about hotels and restaurants closing before January 6, he used disgraceful language to describe and show rage against Washington's Mayor in a hideous rant to his aunt, who often wallowed in, if not encouraged, racist comments from her nephew.

The Defendant came to Washington because he loves this country—not because he wanted to destroy it. He had a sense of excitement about being close to President Donald Trump, when he was to give the last significant speech of his career. For Mr.

Isaacs, he was part of history. For him, January 6 was a way for him to come out of his emotional shell—from his Navy discharge, the tragic death of his father, and even the strains of COVID pandemic—to witness a grand speech from a person whom he *then* revered directly in front of the White House. His trip was to get training to be an EMT. He fully intended to provide security to others, if not go back to his hotel and enjoy the rest of his trip with relatives. Sadly, the "Fight" speech he heard from the President was the spark that changed the mood of the rally from that of a peaceful gathering to an eventual assault on the Capitol. Mr. Isaacs painfully regrets that he succumbed to the uncontrolled emotions of that rally and later entered the Capitol.

At the sentencing, we will ask permission from the Court to hear testimony or a statement from his mother, who has expressed apprehension about filing a letter with the Court because of possible backlash from social media, which can been vitriolic, as well as violent. Nonetheless, Mr. Isaacs' mother will further explain, if not supplement, the difficulties that her impressionable son has had since he was born, the nefarious grooming of her son by his aunt, as well as the peaceful and *solitary* life he has led under very emotionally-challenging circumstances.

Mr. Isaacs' mother and father were married for several years, during which she gave birth to three sons: William; E.I.; and J.I. Mr. Isaacs (the oldest) and brother E.I. have been diagnosed with Autism Spectrum Disorder ("ASD"), about which this Court has heard significant testimony on *two* occasions (pretrial hearing and trial) from Doctor Laurie Sperry and the expert for the United States. Moreover, we incorporate by reference Dr. Sperry's January 1, 2023, report of her ASD findings and her testimony.

His brother E.I. lives in a group home because of his ASD. The youngest brother J.I. lives with their mother; J.I. is a rising senior in high school and may possibly have ASD. Suffice to write that the issue of ASD is something to which Mr. Isaacs has been confronting his entire life, as well as a challenge to other members of his family.

In his very early years (ages 2-4), his mother, who has training and experience in detecting and treating ASD as a social worker, quickly noticed possible signs of ASD in Mr. Isaacs, such as: flapping of hands under stress; coordination issues; "mind blindness" (per Dr. Sperry's testimony); anxiety and sensory overload in crowds; aversion to noise; social awkwardness; and the resistance to touching and hugging by others. Mr. Isaacs' mother sadly remembers how difficult the simple act of walking was to her son, who could barely perform the role of a ring bearer at her sister's wedding. When he was taken to get a haircut by his mother, he had memorable emotional outbursts, when he was merely touched by a barber. What were basic tasks to others his age became profoundly daunting hurdles to Mr. Isaacs.

In primary and middle schools (grades K-8), Mr. Isaacs had difficulties engaging in group activities. He often self-isolated and pushed back from social engagement with others in school. He continued to develop social isolation, but was still able to make a close friend when he was young: a fellow player on recreational baseball teams, which luckily were coached by his friend's father, who was exceedingly empathetic and understanding of the challenges that Mr. Isaacs was facing with ASD.

In April 2011 at age 11, the Defendant's parents separated and later divorced in October 2011. This was obviously traumatic for Mr. Isaacs. His father made every effort

to unjustly isolate him from his mother, who, on paper, had joint custody. However, his father tried at every turn to persuade him and his brothers to disparage and loathe their mother. The father's actions to alienate his sons from the mother had a profoundly negative impact on Mr. Isaacs' already fragile emotional condition.

In high school, Mr. Isaacs became even more isolated from his fellow students. He did not participate in an organized school sport. He made no close friends.  He did not attend proms, dances, or other social events. He did not have his senior photo taken. Mr. Isaacs attended high school, but was emotionally detached from the experience.

After he was graduated from high school, Mr. Isaacs joined the Navy in July 2018. Mr. Isaacs made this valiant attempt at public service to impress his father, whom he utterly revered, and give back to his country. His father was a firefighter for 25 years with a focus on emergency medical services. In no small irony, the Defendant's sense of duty was also driven by his ancestor Robert Fulton, whose statue is in Statuary Hall of the U.S. Capitol. Sadly, Mr. Isaacs failed boot camp miserably in significant part because of his ASD. He was discharged from the Navy October 2018. This discharge was extremely devastating to Mr. Isaacs. He felt as though he had failed his father and his country.

After his Navy discharge, Mr. Isaacs' life went from bad to worse. On January 30, 2019, he witnessed one of the most emotionally-scaring episodes of his life. In the early morning hours, his stepmother screamed that his father was passed out in their bathroom. Mr. Isaacs immediately rushed into the bathroom and found his father unconscious. He tried to give his father CPR, but was unsuccessful. He later learned

that his father had become addicted to narcotics, which caused his overdose on January

30 in the arms of his son.

After his father's tragic death, one would think that Mr. Isaacs' life could not get

any worse. Yet, it did. Sadly, his paternal aunt Traci became more involved and tried to

fill the obviously painful void in his life. Unfortunately, all his aunt did was fill his

vulnerable mind with dark and dangerous thoughts. Memorably, Mr. Isaacs testified at

trial that his aunt questioned whether the earth was flat or round: "And that in itself is

a sign of insanity." He was right on that point.

Shortly before January 6, she successfully persuaded him to nominally join the

Oath Keepers, for which he did little, if anything, other than obtain a T-shirt. The group

would be good for his recovery from the loss of his father. She pleaded with him to

travel to the rally on January 6. She advised that the trip would be good for him. She

promised to be with him the entire time of the trip. Sadly, his aunt would be the sine

qua non that brought him to our Nation's Capitol, where all Mr. Isaacs truly wanted to

there do was get EMT training, help with security, see the tourist sights, and listen to

the last important speech by President Donald Trump in front of the White House.

## OBJECTIONS AND RECOMMENDATIONS FOR USSG CALCULATION

Again, Mr. Isaacs submits that the USSG should be Level 13 (12-18 months);

whereas, the calculations by the USPO and the United States are Level 27 (70-87

months) and Level 30 (97-121), respectively. The Defendant agrees to 14 levels before

adjustments, i.e., a base offense level of 14 (§ 2J1.2(a)).

The Defendant takes the following positions with respect to other calculations: (1) agrees with the United States to a one-level upward departure for terrorism (§ 3A1.4, comment. (n.4)); (2) opposes the denial by the USPO and United States of two levels for acceptance of responsibility (§ 3E1.1(a)); (3) opposes two levels for scope, planning, preparation (§ 2J1.2(b)(3)); (4) seeks four levels for mitigating role, whereas the USPO has recommended only two levels and the United States opposes any reduction (§ 3B1.2(a)); (5) opposes eight levels for person or property damage in order to obstruct the administration of justice (§ 2J1.2(b)(1)(B)); and (6) opposes three levels for interference in administration of justice (§ 2J1.2(b)(2)).

I.  **The Offense Level Should Be Reduced for Acceptance of Responsibility.**

Under USSG § 3E1.1(a), a two-level reduction in the base offense level is appropriate when a "defendant clearly demonstrates acceptance of responsibility for his offense[.]" While "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse," a defendant's conviction at trial "does not *automatically preclude* a defendant from consideration for such a reduction." § 3E1.1 cmt. n. 2 (emphasis added); *see United States v. Shepherd*, 857 F. Supp. 105, 108, n. 8 (D.D.C. 1994); *United States v. Gauvin*, 173 F.3d 798 (10th Cir. 1999).  Indeed,

> [i]n rare situations, a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g. to make . . . a

> challenge to the applicability of a statute to his conduct). In each
> such instance, a determination that a defendant has accepted
> responsibility will be based primarily upon pre-trial statements
> and conduct.

USSG § 3E1.1 cmt. n. 2.

*United States v. Gauvin*, *supra*, is instructive. In *Gauvin*, the defendant was convicted of assault with a dangerous weapon and assault on a federal officer. *Gauvin*, 173 F.3d at 801. Even though the defendant went to trial and was convicted, he was given a two-level reduction based on acceptance of responsibility. *Id*. at 806. According to the court, "Mr. Gauvin admitted to all the conduct with which he was charged. He simply disputed whether his acknowledged factual state of mind met the legal criteria of intent to harm or cause apprehension." *Id*. In the district court's view, that sort of purely legal challenge to a conviction was exactly the kind of rare circumstance in which a two-level reduction was warranted. *Id*. The Tenth Circuit affirmed. *Id*.

As in *Gauvin*, this is one of those rare situations in which a two-level reduction is warranted, even though Mr. Isaacs went to trial. Mr. Isaacs admitted, from the start, the primary factual underpinnings of the case against him. Indeed, Mr. Isaacs has never disputed the conduct underlying his convictions. However, he has vigorously challenged whether his state of mind met the legal criteria of intent that constitutes a federal offense. Those are exactly the kinds of purely legal challenges anticipated by and provided for in the USSG. Accordingly, Mr. Isaacs should receive a two-level departure for acceptance of responsibility.

**A.     Mr. Isaacs Deserves a Reduction for Acceptance of Responsibility
Even if This Court Applies an Obstruction of Justice Enhancement.**

Mr. Isaacs submits that the obstruction of justice enhancement, pursuant to
§ 3C1.1, should not apply in this case. However, if this Court does apply the obstruction
of justice enhancement, Mr. Isaacs still maintains that his base offense level should be
reduced by two levels for his acceptance of responsibility, pursuant to § 3E1.1.
Although the USSG state that an adjustment for acceptance of responsibility
"ordinarily" is not available when a court imposes an adjustment under § 3C1.1, in
"extraordinary cases," both §§ 3C1.1 and 3E1.1 may apply. USSG § 3E1.1, cmt. n. 4; *see
United States v. Kelly*, 169 F. Supp. 2d 171, 174 (S.D.N.Y. 2001) (defendant still received
acceptance reduction despite hindering criminal investigation, suborning perjury and
taking case through trial to verdict); *United States v. Restrepo*, 936 F.2d 661, 669 (2d
Cir.1991) (approving district court's application of adjustments pursuant to both § 3C1.1
and § 3E1.1).

"[W]here a defendant sought to plead guilty to the very charge a jury later
convicted him of, a reduction pursuant to § 3E1.1 is appropriate, notwithstanding his
earlier attempts to evade justice." *Kelly*, 169 F. Supp. 2d at 174. In *U.S. v. Kelly*, the
defendant was charged with the felony of intimidating a witness, and attempted to
plead guilty to misdemeanor witness harassment before trial. *Id.* at 173. However, the
U.S. Attorney's Misdemeanor Committee refused the plea offer and the government
took the defendant to trial on the felony. *Id*. Kelly was ultimately convicted of
misdemeanor harassment rather than felony intimidation. *Id*. "Under the

circumstances," the court concluded, "Kelly's demonstrated willingness to take responsibility for the conduct of which a jury ultimately found him guilty satisfies the requisites of § 3E1.1 and warrants a two-point reduction." *Id.* The court reasoned, "Kelly did seek to accept responsibility formally for his criminal conduct before trial, and it was the government's choice, not his, to proceed." *Id.*

Similarly, Mr. Isaacs' demonstrated willingness to take responsibility by seeking to plead guilty. Through his counsel, Mr. Isaacs engaged in extensive plea deal negotiations with the Assistant United States Attorneys ("AUSA"). Notably, on December 27, 2022, Mr. Isaacs' counsel informed the AUSA, "[i]f you get approval, [Mr. Isaacs] will accept your December 20 plea offer of Counts 3 and 6." The Government, however, ultimately declined the plea terms and opted to proceed to a jury trial.

The United States, and not Mr. Isaacs, chose to pursue a trial. Mr. Isaacs instead sought to take responsibility for his actions, for which a jury ultimately found him guilty. Thus, he should receive a two-level reduction in his base offense level under USSG § 3E 1.1.

## II.   As a Minimal Participant, Mr. Isaacs Should Receive a Four-Level Reduction.

Under USSG § 3B1.2, an offense level may be adjusted downward if the defendant had a mitigating role in the offense. Specifically, the USSG provide that the offense level should be decreased by four levels if the defendant was a minimal participant in the criminal activity, two levels if the defendant was a minor participant in the criminal activity, and three levels in intermediate cases. *See* USSG § 3B1.2.

The commentary to USSG § 3B1.2(a) states that the minimal role reduction is appropriate for a defendant who, like Mr. Isaacs, is "plainly among the least culpable of those involved in the conduct of a group." USSG § 3B1.2 cmt. n. 4. The defendant's "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." *Id*. By contrast, the USSG define a "minor participant" as any participant "who is less culpable than most other participants, but whose role should not be described as minimal." USSG § 3B1.2 cmt. n. 5.

The determination of whether a defendant qualifies as a minimal or minor participant must be made in the context "of the facts of the particular case" and "turns, in large part, upon consideration of the defendant's actual role relative to that of the co-participants and in light of the circumstances giving rise to the crime charged." *United States v. Ingram*, 816 F. Supp. 26, 35 (D.D.C. 1993); USSG § 3B1.2 cmt. n. 3(C). This determination is based on the "totality of circumstances," which may include:

i.   the degree to which the defendant understood the scope and structure of the criminal activity;

ii.  the degree to which the defendant participated in planning or organizing the criminal activity;

iii. the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

iv.  the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and

v.   the degree to which the defendant stood to benefit from the criminal activity.

*id*. n.3.

Although the USPO recommends a two-level reduction for Mr. Isaacs as a minor participant, the totality of the circumstances supports a four-level reduction as a minimal participant. *See* PSR ¶ 130; ECF Doc. 1021-1 at 30-31. First, Mr. Isaacs lacked understanding of the criminal activity's scope and structure. Other than communicating with his aunt before January 6 mostly about routine travel plans, he had minimal knowledge, if any, of the nefarious motives of others, including those who brought firearms to January 6.

Second, he had no role in planning or organizing the criminal activity. Indeed, the Government acknowledges that while Defendants Rhodes, Kelly Meggs, and Watkins participated in "the creation and use of encrypted messaging services and meeting platforms to assist with planning and coordination, and preparations to have an armed QRF to support co-conspirators on the ground inside of D.C," Mr. Isaacs "did not personally participate in all of this relevant conduct." ECF Doc. 1021-1 at 30.

Third, Mr. Isaacs held absolutely no decision-making authority or leadership position within the Oath Keepers and was not part of any leadership chat groups. He was a "minor player[] in the overarching conspiracy." PSR ¶ 183; ECF Doc. 1010 at 2.

Fourth, the Government relies on Mr. Isaacs' actions of moving "to the front of 'Line One'" and "waiv[ing] others down the hallways toward the Senate Chamber yelling, 'The fight's not over!'" as evidence against minimal participation, yet these actions highlight his limited involvement, supporting his case as a minimal participant. ECF Doc. 1021-1 at 31-32.

Fifth and last, Mr. Isaacs had no potential gains from the criminal activity. Accordingly, Mr. Isaacs was a minimal participant in the conspiracy, justifying a four-level reduction.

### III.     A Two-Level Increase for Conduct Extensive in Scope, Planning, or Preparation (§ 2J1.2(b)(3)(C)) Is Unjustified.

The PSR incorrectly suggests that a two-level enhancement should be added to Mr. Isaacs' guidelines under USSG § 2J1.2(b) for an offense that was allegedly "extensive in scope, planning, or preparation." § 2J1.2(b)(C). While the overall scheme may have displayed extensive traits, Mr. Isaacs' involvement was limited and fails to justify a two-level increase.

First, Mr. Isaacs was not a leader of the Oath Keepers or the conspiracy; instead, he was a "minor player[] in the overarching conspiracy."  ECF Doc. 1010 at 2; *see* ECF Doc. 1021-1 at 30-31; PSR ¶¶ 130, 183.

Second, the Government concedes that while Rhodes, Kelly Meggs, and Watkins participated in "the creation and use of encrypted messaging services and meeting platforms to assist with planning and coordination, and preparations to have an armed QRF to support co-conspirators on the ground inside of D.C," Mr. Isaacs "did not personally participate in all of this relevant conduct." ECF Doc. 1021-1 at 30.

Finally, Mr. Isaacs did not partake in a key conference call that the PSR claims "sketched out the details of how the defendants would achieve their objective." PSR ¶ 63. Accordingly, Mr. Isaacs' limited role in the conspiracy does not amount to the extensive scope, planning, or preparation that would warrant a two-level increase.

**IV.** **Isaacs Did Not Willfully Obstruct Justice or Commit Perjury.**

Mr. Isaacs should not receive a two-level enhancement under USSG § 3C1.1 because he did not willfully obstruct justice or commit perjury. This enhancement applies only if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

USSG § 3C1.1.

Application Note 2 of USSG § 3C1.1 sets forth *limitations* to this enhancement that apply to Mr. Isaacs' conduct and testimony:

> In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

USSG § 3C1.1 cmt. n. 2.

Additionally, an enhancement for perjury at trial under this section can be imposed only if the defendants gave "false testimony concerning a *material* matter with the *willful intent* to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *U.S. v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (emphasis added).

Here, the USPO and United States suggest a two-level enhancement based on allegations that Mr. Isaacs "falsely testified, under oath, that he did not understand the meaning of the word 'Rubicon' in his message of December 23, 2020," and that he

originally claimed he did not know why he yelled, "The fight's not over!," but later testified he was speaking of "a verbal First Amendment fight." However, these alleged discrepancies are not material to this case as they have failed to have a substantial bearing on Mr. Isaacs' culpability and, therefore, are insufficient to warrant a two-level enhancement under USSG § 3C1.1.

Likewise, there was nothing willful about Mr. Isaacs' testimony and alleged immaterial inaccuracies. When he testified at trial, Mr. Isaacs tried his best under stressful conditions in front of the jury to answer a truthful as he could.

Moreover, many of the cases the United States relies upon for this enhancement involve defendants who destroyed and/or had someone else destroy material evidence. *See* ECF Doc. 1021-1 at 32-33. Mr. Isaacs, however, *never* concealed or destroyed evidence, and the Government has not alleged that he did so. Accordingly, these case facts and holdings offer no support for this enhancement's application to Mr. Isaacs' sentence.

Finally, the trial's last witness (Officer Harry Dunn), who was called by the United States, provided exculpatory testimony that belies the assertion that Mr. Isaacs was a leader of an angry mob inside the Capitol, when he yelled "the fight's not over!" What Officer Dunn said was very instructive.  Countless persons inside the Capitol were chanting and *repeating* this exact phrase.  With his ASD, we should not be surprised that he too repeated this phrase, which was pervasive inside the Capitol. When he said his statement was a "verbal First Amendment fight," he was truthful.

**V.**   **Mr. Isaacs' Youth Warrants a Downward Departure.**

At the mere age of 21 on January 6, Mr. Isaacs is one of the youngest defendants

from among the approximately 1,000 January 6 cases. This youthfulness merits a

downward departure under U.S.S.G § 5H1.1, which states:

> "Age (*including youth*) may be relevant in determining whether a
> departure is warranted, if considerations based on age, individually or in
> combination with other offender characteristics, are present to an unusual
> degree and distinguish the case from the typical cases covered by the
> guidelines."

Indeed, adolescents "are constitutionally different from adults for sentencing

purposes," as "adolescent brains are not yet fully mature in regions and systems related

to higher-order executive functions such as impulse control, planning ahead, and risk

avoidance." *Miller v. Alabama*, 567 U.S. 460, 471-472 n.5 (2012) (internal quotation marks

and citation omitted). This immaturity and underdeveloped sense of responsibility

leads to recklessness, impulsivity, and heedless risk-taking. *Id.* Additionally,

adolescents are particularly vulnerable to negative external pressures from peers and

less able to escape their social context. *Graham v. Florida*, 130 S. Ct. 2011, 2026 (2010).

Here, Mr. Isaacs' limited maturity and underdeveloped sense of responsibility

led to impulsive actions and susceptibility to the mob mentality on January 6th. His

prolonged exposure to influence, especially from his aunt, played a pivotal role in

shaping his actions on that day. While this does not excuse his actions, Mr. Isaacs' age-

related lack of maturity and impulsiveness must be factored into his sentencing. Since

January 6, Mr. Isaacs has demonstrated his commitment to making amends and

becoming a productive member of our nation. Accordingly, Mr. Isaacs respectfully requests that this Court acknowledge his youth and apply a downward departure.

**VI.**     **The Eight-Level Enhancement at USSG § 2J1.2(B)(1)(B) is Inapplicable.**

The PSR (ECF Doc. 1009, par. 157), applies an eight-level enhancement pursuant to USSG § 2J1.2(b)(1)(B), which provides that "[i]f the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, increase by 8 levels." Mr. Isaacs submits that this enhancement is inapplicable here, both as a legal and factual matter.

**A.**     **Electoral Certification Does Not Constitute the "Administration of Justice" Under a Plain Language Interpretation of USSG § 2J1.2(B)(1)(B).**

For the eight-level enhancement to attach, the Guidelines require that the described conduct have been undertaken in order to obstruct the "administration of justice." In *United States v. Seefried*, No. 21-cr-287 (TNM) (D.D.C. October 31, 2022), Judge McFadden issued a thorough opinion explaining why, as a legal matter, the eight-level enhancement is inapplicable to the January 6 defendants because the electoral certification, the proceeding the defendants are charged with obstructing, does not constitute the "administration of justice" under the meaning of the guidelines. The undersigned is aware that this Court is familiar with the *Seefried* opinion and declined to adopt its reasoning in *United States v. Wood*, No. 21-CR-223 (APM) (ECF Doc. 64). Mr. Isaacs respectfully asks that this Court reconsider its rejection of the reasoning in *Seefried*. To that end, this memorandum addresses the issues that this Court raised at

Mr. Wood's sentencing hearing while stating its disagreement with Judge McFadden's analysis. A brief review of the key points in *Seefried* provides a helpful framework.

First, a plain reading of the phrase "administration of justice," as informed by relevant dictionary definitions, establishes that this phrase refers to judicial or quasi-judicial proceedings, and related activities, involving the determination of legal rights.

Second, a contextual analysis, reviewing the Sentencing Commission's relevant commentary and utilizing corpus linguistics to better understand trends of usage, bolsters that "administration of justice" most naturally refers to judicial proceedings or closely related activities.

Third, United States Supreme Court and Circuit Court precedent affirms Judge McFadden's interpretation.

Courts "interpret the Sentencing Guidelines using the ordinary tools of statutory interpretation." *United States v. Martinez*, 870 F.3d 1163, 1166 (9th Cir. 2017). Thus, the inquiry into meaning "will most often begin and end with the text and structure of the Guidelines." *Id.* (citation omitted). "The language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011). To discern a text's plain meaning, courts often look to dictionary definitions, in addition to analyzing the word or phrase in context. *See, e.g.*, *Kaufman v. Nielsen*, 896 F.3d 475, 485–87 (D.C. Cir. 2018).

### i. Dictionary Definitions.

At the sentencing hearing in *Wood*, this Court noted that Black's Law Dictionary defines certain terms arguably related to the administration of justice more broadly than

the narrower definition that *Seefried* cites. Black's defines the "administration of justice" as "[t]he **maintenance of right** within a political community by means of the physical force of the state; the state's application of the sanction of force **to the rule of right**." *Administration of Justice*, Black's Law Dictionary (11th ed. 2019) (in this section, all emphasis is supplied, unless otherwise noted). It similarly defines "due administration of justice" as "[t]he proper functioning and integrity **of a court or other tribunal** and the proceedings before it **in accordance with the rights guaranteed to the parties**." *Id.*

While these definitions support a narrow interpretation of the phrase to mean judicial or quasi-judicial proceedings, and related activities, involving the determination of legal rights, in *Wood*, the Government looked to the broader definition of "justice." That definition includes the "fair and proper administration of laws." *Justice*, Black's Law Dictionary (11th ed. 2019). But the utility of dictionary definitions diminishes if we ignore how the word is used syntactically. In § 2J1.2(b)(1)(B), "justice" is the subject of "administration." As Black's provides a definition specifically for the full phrase "administration of justice," there is no compelling reason to stretch that definition by zeroing in on sub-definitions of the individual words within the larger phrase.

The importance of the larger phrase is underscored by the Government's reliance in *Wood* on the definition of "obstruction of justice"; i.e. "[i]nterference with the orderly administration of law and justice, **as by** giving false information to or withholding evidence from a police officer or prosecutor, or by harming or intimidating a witness or juror." *Obstruction of Justice*, Black's Law Dictionary (11th ed. 2019). At the outset, the fact that Black's supplies separate definitions for "administration of justice" and

"obstruction of justice" only further demonstrates that these phrases are not interchangeable. This distinction finds support in case law. *See United States v. Warlick*, 742 F.2d 113, 115-16 (4th Cir. 1984):

> ***Obstruction of the administration of justice is not to be confused with obstruction of justice***. Justice may be obstructed by mere inaction, but obstruction of the administration of justice requires something more—some act that will interrupt the orderly process of the administration of justice, or thwart the judicial process.

But even if this Court finds value in the definition of "obstruction of justice" as a related phrase, this definition does not undercut the conclusion that the electoral certification is not contemplated by § 2J1.2(b)(1)(B). If anything, this definition bolsters the interpretation of "administration of justice" as judicial or quasi-judicial proceedings, and related activities, involving the determination of legal rights. The "obstruction of justice" definition provides that such conduct is undertaken "by giving false information to or withholding evidence from a police officer or prosecutor, or by harming or intimidating a witness or juror." The investigatory activities implicated by this definition fit squarely within the universe of judicial and quasi-judicial processes. Perhaps more notably, this definition does ***not*** implicate ceremonial proceedings that have no adjudicatory function, such as the electoral certification.

Finally, Black's definition of "contempt" does not support a broader interpretation. "Contempt" is defined to include "[c]onduct that defies the authority or dignity of a court ***or legislature***," with the definition adding that "[b]ecause such conduct interferes with the ***administration of justice***, it is punishable." Reaching for this attenuated definition of "contempt" to assign meaning to "administration of

justice" is simply unnecessary when this phrase is itself defined in the same dictionary. Further, contempt as it relates to the legislature is wholly irrelevant in Mr. Isaacs' case. Contempt in the legislative context arises in quasi-judicial inquiries, generally applying where congressional witnesses fail to comply with subpoenas. Such quasi-judicial, fact-finding functions of the legislature may very well fit within the definition of "administration of justice." But the electoral certification is not one of those quasi-judicial legislative proceedings.

Because the above definitions of terms distinct from, but arguably related to, the "administration of justice" are all either irrelevant or actually bolster the narrower interpretation of the term, the eight-level enhancement at § 2J1.2(b)(1)(B) is legally inapplicable.

ii.     **Section 2J1.2's Application to Statutory Offenses Unrelated to Judicial Proceedings.**

This Court in *Wood* considered that § 2J1.2, as a whole, applies to various statutory offenses which do not involve interference with judicial or quasi-judicial proceedings. But the fact that § 2J1.2, as a whole, includes enhancements applicable to a wider range offenses does not mean that every subsection must be applicable to every offense that the broader section applies to.  Reading subsection 2J1.2(b)(1)(B) as applying only to a certain sub-category of offenses, while other subsections similarly apply only to different sub-categories, is perfectly consistent with reading the various enhancements within § 2J1.2 as individual pieces of a larger whole.

### iii. __Sentencing Committee Commentary__.

Initially, Mr. Isaacs submits that reliance on Sentencing Committee commentary is unwarranted where the plain language of the text and relevant dictionary definitions provide clear guidance. *See, e.g.*, *Martinez*, 870 F.3d at 1166; *Fulford*, 662 F.3d at 1177; *Kaufman*, 896 F.3d at 485–87. Nevertheless, to the extent such commentary is relevant, this commentary does not undermine the above analysis.

This Court in *Wood* observed that the commentary accompanying § 2J1.2 defines "substantial interference with the administration of justice" as "includ[ing] a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." The first two clauses of this definition, discussing felony investigations, indictments, verdicts, and the like, relate directly to judicial proceedings.

Concededly, when read alone, the last clause ("the unnecessary expenditure of substantial governmental or court resources") appears to broaden the definition beyond activities related to judicial proceedings. But this clause must be read in the context of the full sentence. *See* Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 195-98 (2012) (explaining that words "associated in a context suggesting that [they] have something in common . . . should be given related meanings" under the *noscitur a sociis* canon). Read against the two proceeding clauses, "the unnecessary expenditure of substantial governmental or court resources" is most naturally

understood as referring to resources utilized in the category of judicial activities specifically enumerated in the preceding clauses.

The *ejusdem generis* canon, a related interpretative tool, bolsters this reading. "General words in a statute are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 73 Am. Jur. 2d *Statutes* § 118 (2023). Here, the final clause should be read as a catchall term encompassing the larger category of activities implicated by the specific items enumerated before it; i.e., activities that all relate to judicial proceedings. When informed by the context of the earlier clauses, the final clause cannot fairly be stretched to encompass a proceeding as remote as the electoral certification. Thus, assuming that committee commentary is due any deference, this commentary supports the preceding plain language analysis.

### iv.   Summation.

As the foregoing argument demonstrates, the electoral certification does not constitute the "administration of justice" under a plain language interpretation of USSG § 2J1.2(b)(1)(B). *See also United States v. Richardson,* 676 F.3d 491, 502-03 (5th Cir. 2012) ("[O]bstructing the due administration of justice means 'interfering with the procedure of a judicial hearing or trial.'"); *United States v. Brenson*, 104 F.3d 1267, 1279-80 (11th Cir. 1997) (The "due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed."); *Warlick*, 742 F.2d at 115-16 ("[O]bstruction of the administration of justice requires . . . some act that will

interrupt the orderly process of the administration of justice, or thwart the judicial

process.").

     **B.**    **Mr. Isaacs' Conduct Was Not Sufficient to Trigger the
<u>USSG § 2J1.2(B)(1)(B) Enhancement as a Factual Matter.</u>**

Even if this Court disagrees with the foregoing and concludes that the

enhancement is legally applicable, the facts of Mr. Isaacs' conduct necessitate that the

eight-level enhancement be removed. As this Court is aware, the enhancement requires

that the offense involve "causing or threatening to cause physical injury to a person, or

property damage, in order to obstruct the administration of justice." Mr. Isaacs' actions,

while wrong and deeply regrettable, do not meet this threshold, just as this Court found

as to the defendant in *Wood*.

Mr. Isaacs did not personally assault officers. Mr. Isaacs did not personally

damage property. At most, the Government might be able to assert that Mr. Isaacs was

a part of larger mobs that pushed toward or confronted police. This Court, however,

rejected a similar argument in *Wood*, finding the defendant's role in a mob was

insufficient to trigger the enhancement where the defendant was one step removed

from direct confrontation with the line of police officers. *Wood*, No. 21-CR-223 (APM)

[Doc. 64 at 30:18-31:15]. Judge Friedrich likewise found, in *United States v. Reid*, No. 21-

CR-316 (DLF) [Doc. 59], that the enhancement was unwarranted where the defendant

was part of a mob, but was not, himself, pushing police officers. *See Reid*, 21-CR-316

(DLF) (ECF Doc. 59 at 17:12-17:17):

[THE COURT:] Any of those confrontations physical? I know he was towards the front of some scrums, but do you -- I couldn't see him pushing or --

[PROSECUTION:] No, we're not suggesting that he did any pushing. We're suggesting that he was a part of those sort of mob actions of pushing through the police lines.

Thus, if this Court chooses to apply section 2J1.2(b)(1)(B) as a legal matter, it should nonetheless find that the eight-level enhancement is not triggered because Mr. Isaacs' conduct did not rise to the level of causing or threatening to cause physical injury to a person or property.

## VII. The Three-Level Enhancement for Interference with the Administration of Justice (§ 2J1.2(b)(2)) is Legally Inapplicable.

For the reasons described in Section VI.A. *supra*, Mr. Isaacs submits that the three-level enhancement at USSG § 2J1.2(b)(2) is legally inapplicable because the electoral certification does not constitute the "administration of justice" under the meaning of the guidelines.

## SENTENCING FACTORS

Again, pursuant to 18 U.S.C. § 3553(a) ("Imposition of a sentence"), this Court is required to impose a sentence that is "*sufficient, but not greater than necessary*" to comply with four purposes (goals) of § 3553(a)(2)(A)-(D) and hereby summarized: (1) to reflect the seriousness of the offense, promote respect for the law, and to provide for just punishments for the offense; (2) adequate deterrence; (3) protect the public from further crimes of the defendant; and (4) provide training, medical care, or other correctional treatment.

In striving for a sentence that meets some or all of these purposes and goals, this Court shall consider the seven factors of § 3553(a)(1)-(7).  We respectfully submit that the history and characteristics of Mr. Isaacs, whose life story has often been filled with heart-wrenching moments, provide a profound basis for showing him compassion. Moreover, there is no reason to believe that he will not be forever shamed by his actions on January 6; this shame alone will be incentive for him to comply with the law. Last, we submit that a variance from the USSG is fully warranted and consistent with the goals set forth in this section.

## **CONCLUSION**

Mr. William Isaacs asks that this Honorable Court impose a sentence of six months of home confinement, plus three years of supervision, for each of the seven counts of conviction.

Respectfully submitted,

_____/s/_____
Gene Rossi, Esquire
D.C Bar Number 367250
Carlton Fields, P.A.
Suite 400 West
1025 Thomas Jefferson Street, NW
Washington, DC 20007-5208
Telephone: 202-965-8119
Cell: 703-627-2856
Email: grossi@carltonfields.com

Natalie A. Napierala, Esquire
New York State Bar Number 2445468
Carlton Fields, P.A.
36th Floor
405 Lexington Avenue
New York, NY 10174-0002

Telephone: 212-785-2747
Email: nnapierala@carltonfields.com

Charles M. Greene, Esquire
Florida Bar Number 938963
Law Offices of Charles M. Greene, P.A.
55 East Pine Street
Orlando, FL 32801
Telephone: 407-648-1700
Email: cmg@cmgpa.com

*Counsel for Defendant William Isaacs*

## CERTIFICATE OF SERVICE

I hereby certify that Mr. Isaacs' sentencing memorandum was filed with the

Clerk of the Court via ECF on Monday, August 21, 2023.

Respectfully submitted,

_____/s/_____

Gene Rossi, Esquire